UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO.: 9:18-cv-80752

BRIAN ELFUS,

       Plaintiff,

v.

IMPACT SPORTS BASKETBALL LLC,
IMPACT – A SPORTS MANAGEMENT
CORPORATION, JS SPORTS FUNDING
LLC, J&J SPORTS AGENCY MM LLC
and MITCHELL FRANKEL

       Defendants.

_____/

## COMPLAINT & DEMAND FOR JURY TRIAL

Plaintiff, Brian Elfus, by and through undersigned counsel, files this Complaint against Defendants IMPACT SPORTS BASKETBALL LLC, IMPACT – A SPORTS MANAGEMENT CORPORATION, JS SPORTS FUNDING LLC, J&J SPORTS AGENCY MM LLC and MITCHELL FRANKEL, and states as follows:

## OVERVIEW

Brian Elfus, a veteran sports agent, was chosen among hundreds of National Basketball Players' Association certified player agents to be the representative of college basketball standout Kawhi Leonard as Leonard transitioned from being a college basketball star to an NBA player in 2011. Leonard, who was only 19-years-old at the time, put his trust in Elfus to be his fiduciary in negotiating his professional contracts as well as take care of his business pursuits off the court. Elfus remained Leonard's agent for many years and included Impact Sports Basketball

owner Mitch Frankel on Leonard's Standard Player Agent Contract. This Complaint emanates from the wrongful deprivation of agent fees due to Elfus by Frankel and all affiliated corporate entities and investors named herein, which include the agent fees derived from Leonard as well as other professional basketball players and coaches. In total, Elfus generated over $5,000,000.00 in commissions during the six years of his business relationship with Impact Sports Basketball, and other than receipt of a bi-monthly salary (that failed to fairly compensate him for his time as an employee), Elfus was not compensated accordingly. Elfus is entitled to commissions either (1) per a contractual agreement drafted by Impact Sports Basketball that is so unintelligible and truly a textbook example of how not to draft a contract that it should be deemed null and void; (2) other oral and written promises made by the Defendants to Mr. Elfus; and/or (3) based on the unjust enrichment of the Defendants as a result of a clear understanding that Mr. Elfus was entitled to commissions emanating from represented basketball players, and the Defendants refuse to provide Elfus his portion of fees.

## **PARTIES**

1.   Plaintiff, Brian Elfus ("Mr. Elfus"), has a primary residence in San Diego County, California, and is an experienced sports agent and basketball industry veteran who currently serves as the President of Elfus Sports Management and is a player agent with the National Basketball Players' Association ("NBPA").

2.   Defendant, Mitchell Frankel ("Mr. Frankel"), an individual, has a primary residence in Palm Beach County, Florida and is the sole Manager of Impact Sports Basketball LLC, doing business in the State of Florida with a principal address of 2401 N.W. Boca Raton Blvd, #200, Boca Raton, FL 33431 ("ISB"); the sole Manager of Impact Sports Football LLC, doing business in the State of Florida with a principal address of 2401 N.W. Boca Raton Blvd, #200, Boca

Raton, FL 33431; and the "PVTC" of IMPACT – A Sports Management Corporation, doing business in the State of Florida with a principal address of 2401 N.W. Boca Raton Blvd ("IMPACT"). Frankel is certified as a Contract Advisor with the National Football League Players' Association ("NFLPA") and the NBPA.

3.  Defendant, Impact Sports Basketball, was incorporated in the State of Florida in 2010 and is currently an active limited liability company with a principal address of 2401 N.W. Boca Raton Blvd, #200, Boca Raton, FL 33431 and a mailing address of 21218 St. Andrews Blvd, #302, Boca Raton, FL 33433.

4.  Defendant, IMPACT – A Sports Management Corporation, was incorporated in the State of Florida in 1994 and is currently an active corporation with a principal address of Impact Sports Management, 2401 N.W. Boca Raton Blvd, #200, Boca Raton, FL 33431 and a mailing address of 21218 St. Andrews Blvd, #302, Boca Raton, FL 33433.

5.  Defendant, JS SPORTS FUNDING LLC ("JS"), is a New York corporation with its principal place of business located at 500 Fifth Avenue, New York, New York 10036. It is a creditor to IMPACT and an affiliated entity STMR, LLC ("STMR") and recipient of fees related to agent commissions paid by professional athletes based on the negotiation of their playing contracts. Upon information and belief JS is either affiliated with or the alter ego of J&J Sports Agency, LLC, JS Holdings LLC, J&J Sports Agency Investor LLC and/or all owned and managed by Mr. Jeff Sutton and Mr. Joseph Sutton.

6.  Defendants, J&J SPORTS AGENCY MM LLC ("J&J MM"), is a Delaware limited liability company with its principal place of business at 500 Fifth Avenue, New York, New York 10036, and is either doing business with JS or is the alter ego of JS. Upon information and belief, J&J MM is owned and managed by Mr. Jeff Sutton and Mr. Joseph Sutton.

## JURISDICTION AND VENUE

7.   This action is a civil action over which this Court has original jurisdiction under 28 U.S.C. § 1332(a), because there is diversity of citizenship among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of costs and attorneys' fees. The Plaintiff is not a citizen of Florida and there is complete diversity between the parties under 28 U.S.C. § 1332.

8.   Pursuant to Fla. Stat. § 48.193, this Court has personal jurisdiction over Mr. Frankel, IMPACT, ISB, JS and J&J MM, because at all relevant times they conducted, engaged in, and carried on business in Florida, and were registered to transact business in Florida, and maintained an office in Palm Beach County, Florida.

9.   Jurisdiction in this Court is also proper as a claim is brought pursuant to the Fair Labor Standards Act, as amended (29 U.S.C. § 201, et seq., hereinafter referred to as the "FLSA") to recover unpaid wages, an additional equal amount as liquidated damages, obtain declaratory relief, and reasonable attorney's fees and costs.

10. The December 15, 2010 "Term Sheet/Agreement" between Mr. Elfus and ISB is a material element of the dispute and the contents of which are in dispute. Said document indicates that it "shall be governed by and construed as to the validity, enforcement, interpretation, construction, effect and in all other aspects by the laws of the State of Florida." Further, venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) and (c), as this controversy arises in this district where Defendants' wrongful actions have occurred and where at all relevant times Defendants regularly conducted business.

11. This is not a dispute that is subject to the NBPA Regulations Governing Player Agents (the "NBPA Regulations") nor its internal dispute resolution procedure, as the NBPA

Regulations did not contain any language providing that player agents be compelled to mandatory arbitration during the period under which this dispute originally arose.

12. All conditions precedent to the filing of this action have been satisfied, have been performed or have been waived.

## GENERAL ALLEGATIONS

### Mr. Elfus Enters Into a Business Relationship with ISB and Mr. Frankel

13. On December 15, 2010, Mr. Elfus and Michael Siegel ("Mr. Siegel") purported to enter into what was titled as a "Term Sheet/Agreement" with ISB wherein ISB guaranteed Mr. Elfus an annual salary, an annual budget to cover business-related expenses and professional basketball player contract-related commissions that Mr. Elfus was to share with Mr. Siegel (attached hereto as **Exhibit "A"** and referred to herein as the "ISB Agreement").

14. On or around the date of the ISB Agreement, Mr. Elfus assigned his $1,200,000.00 player agent commission from NBA player Tyrus Thomas to ISB, which immediately infused ISB with liquidity and covered Mr. Elfus' salary payments for years to come.

15. It is wholly unclear whether the ISB Agreement is valid, binding and enforceable based upon numerous ambiguities and unintelligible language used therein, as well as the course of conduct of the parties named in the ISB Agreement during their years' long relationship.

16. If the ISB Agreement is valid, binding and enforceable, then it is also unclear as to what the actual terms of the ISB Agreement are.

17. Initially, it appears that the ISB Agreement required that ISB pay Mr. Elfus a commission of seventy-five percent (75%) on profits derived by ISB from clients that Mr. Elfus represented prior to December 15, 2010, including but not limited to Tyrus Thomas, and sixty percent (60%) on profits derived by ISB from clients to be secured by Mr. Elfus after December 15, 2010. It

was understood that Mr. Elfus had come to his own arrangement with Mr. Siegel as to how each Mr. Elfus and Mr. Siegel would share in the professional basketball contract-related commissions received from ISB and, subsequent to Mr. Elfus' employment with ISB, Mr. Elfus entered into a settlement agreement with Mr. Siegel that specifically breaks down any fees Mr. Elfus would owe Mr. Siegel based on the outcome of this instant dispute.

18. The aforesaid respective seventy-five percent (75%) and sixty percent (60%) commissions were to be paid out to Mr. Elfus after Mr. Elfus reimbursed ISB $22,220.15, which Mr. Elfus acknowledged as a debt and which Mr. Elfus soon thereafter provided to ISB. The ISB Agreement also included derivations of the standard seventy-five percent (75%) and sixty percent (60%) splits in profit, which are extremely difficult to comprehend.[1]

19. The ISB Agreement required ISB and Mr. Elfus to classify all existing and future clients, as well as determine their correspondent applicable professional basketball contract-related commission splits, in good faith. ISB has failed terribly in this regard.

20. Further, the ISB Agreement specifies that the collection of revenues from represented professional basketball players was to be "jointly performed by the Parties in good faith." Instead, Mr. Frankel, ISB, IMPACT, Mr. Jeff Sutton, Mr. Joseph Sutton and/or JS (or JS' related entities, including but not limited to J&J MM) have collected all of the monies and failed to even provide an accounting to Mr. Elfus nor deliver those revenues belonging to Mr. Elfus under the ISB Agreement and all relevant Standard Player Agent Contracts. ISB only provided Mr. Elfus

---

[1] The very confusing ISB Agreement, drafted by legal counsel selected by ISB, includes pages that include a "Preferred Tree/Thornton" scenario, "Future Client/Thornton" scenario, "Excess Budget" scenario, "Pure Tree" scenario, "Converted Tree" scenario and "Hybrid Tree" scenario, all of which would skew the split of profits as between ISB and Mr. Elfus. For instance, under the "Excess Budget" scenario, Messrs. Elfus and Siegel could contribute up to seventy percent (70%) of the expenses attributed to a future ISB client in exchange for a maximum of seventy five (75%) of the profits, as opposed to the standard sixty percent (60%) on new clients.

with a portion of the salary payments as stated in the ISB Agreement and failed to account for the actual number of hours Mr. Elfus worked.

21. The ISB Agreement also required ISB to receive input from Mr. Elfus before incurring any expenses, in good faith, regarding any accounting attributable to a player, but ISB failed in this regard. For example[2], ISB never sought or received input from Mr. Elfus (or since provided substantiation) prior to:

    a.  ISB placing Mr. Leonard's uncle and mother on ISB's payroll for at least the last five (5) years;

    b.  Spending significant and unnecessary monies on a series of incidents of waste and possible criminal behavior that went unchecked and unsupervised at ISB, including but not limited to the actions of Carlos Dew[3] and Deondre Boynton;

    c.  Incurring a curious expenditure of $360,000 for a particular client during the 2016 NBA Draft workouts;

    d.  Making payments to a "KL3" for $17,741.35 and "KL4" for $16,189.62[4];

    e.  Incurring expenses of $429,822.87 cumulative to basketball players Terrico White, Alex Young, Dexter Pittman and Jarvis Varnado;

    f.  Incurring expenses of $74,090.94 for basketball player Sir'Dominic Pointer;

    g.  Incurring expenses of $338,805.00 for basketball player Will Barton;

---

[2] There are many more examples not included herein.

[3] *See* Mark Burns, "Report: Impact Sports Basketball Suffers Setback," Sports Agent Blog, June 17, 2014, *at* http://sportsagentblog.com/2014/06/17/report-impact-sports-basketball-suffers-setback/ ("Impact recently lost one of its top recruiters in Carlos Dew, according to a source close to the situation. According to the source, Impact Basketball fired Dew because he allegedly stole money and clients from Impact.").

[4] Upon information and belief, "KL" is an abbreviation for Kawhi Leonard, but Mr. Elfus is unaware as to the meaning of the numbers attached to each abbreviation.

    h.   Incurring expenses of $34,116.83 for basketball player Isaiah Cousins;

    i.   Incurring expenses of $407,451.39 for basketball player Tyrus Thomas;

    j.   Incurring expenses of $20,058.91for basketball player Thomas Robinson;

    k.   Incurring expenses of $37,326.78 for basketball player Terrel Harris; and

    l.   Incurring expenses of $22,857.49 for basketball player Elliot Williams.

22. Despite the myriad expenses that ISB incurred, most of which were incurred without Mr. Elfus' input, Mr. Elfus was always told by Mr. Frankel that if Mr. Elfus' clients were profitable, then Mr. Elfus would get paid on them. However, Mr. Elfus received no specific commissions for six (6) years working as an employee at ISB, though bi-monthly unallocated payments were made, despite assigning the $1,200,000.00 player agent commission from Tyrus Thomas at the inception of their relationship.

23. The aforesaid bi-monthly unallocated payments were made under the ISB Agreement, whereby ISB promised to pay Mr. Elfus a minimum of an $80,000.00 salary and provide Mr. Elfus with $40,000.00 to reimburse business-related expenses during each year that Mr. Elfus was employed by ISB. ISB, in the ISB Agreement, acknowledged that Mr. Elfus' salary and expense budget "shall be determined in good faith by the Parties during each ISB Year and reviewed and adjusted as necessary by the Parties throughout each ISB Year to consider changes" in the revenue brought in by Mr. Elfus as well as "market circumstances and conditions." ISB only made those bi-monthly unallocated payments to Mr. Elfus, below the amounts promised, and did not provide Mr. Elfus any separate commissions.

24. ISB was required to implement applicable adjustments to Mr. Elfus' budget on or before February 28, April 30, June 1, October 31 and December 31 of every year; however, it failed with regard to this obligation.

### Kawhi Leonard Becomes a Client of Messrs. Elfus and Frankel

25. On April 14, 2011, the now two-time NBA All-Star, two-time All-NBA First Team and 2014 NBA Champion, Kawhi Leonard ("Mr. Leonard") declared for the 2011 NBA Draft after his sophomore season at San Diego State University and indicated that he would not return to school, as he intended to soon thereafter hire an NBPA certified player agent.

26. While many agents solicited Mr. Leonard, he did not take long to determine that Mr. Elfus was the right choice and entered into a Standard Player Agent Contract that directed NBA teams to speak to and negotiate with Mr. Elfus as Mr. Leonard's player agent.

27. Mr. Elfus was a zealous advocate for Mr. Leonard on and off the basketball court throughout his representation of Mr. Leonard.

28. As Mr. Leonard's fiduciary, Mr. Elfus not only ensured that Mr. Leonard maintained a squeaky clean reputation, but also assisted in negotiating (i) a four-year $8.3 million contract with the San Antonio Spurs; (ii) marketing deals with Jordan Brand, BBVA, and Wingstop; and (iii) most notably, a contract on July 16, 2015 that would guarantee Mr. Leonard almost $100 million.

29. On July 2, 2015, prior to signing the roughly $100 million contract, Mr. Leonard executed a new Standard Player Agent Contract naming Messrs. Elfus and Frankel as his player agents and agreeing to pay a four percent (4%) commission to his player agents for contracts negotiated, under the 2015 SPAC (attached hereto as **Exhibit "B"** and referring to herein as the "2015 SPAC").

30. On July 16, 2015, Mr. Leonard signed an agreement with the San Antonio Spurs that guaranteed him $94,343,130.00 over a five-year span, and which included an agent certification form attached thereto that was executed by Messrs. Elfus and Frankel as Mr. Leonard's player

agents who assisted in the negotiation of Mr. Leonard's contract with the Spurs (attached hereto as **Exhibit "C"**).

31. While Mr. Frankel was also listed on the 2015 SPAC and the agent certification form, it was Mr. Elfus who masterfully handled Mr. Leonard's negotiation with the San Antonio Spurs.[5]

32. San Antonio Spurs general manager R.C. Buford wrote to Mr. Elfus after Mr. Leonard's most recent contract negotiations to thank him for working with the organization to "keep Kawhi a part of our family for years to come," recognizing Mr. Elfus' integral role in negotiating Mr. Leonard's contract with the Spurs.

33. Mr. Elfus' artful negotiation skills and advocacy on behalf of Mr. Leonard was noted by many, including but not limited to Mark Zeigler of the *San Diego Union-Tribune*, who noted in an October 27, 2015 article titled, "Kawhi Leonard: A rich man, not a changed man," that "[Mr. Leonard] makes $18.8 million per year and, thanks to a clause negotiated into the contract by [Brian] Elfus, could become eligible for unrestricted free agency and even bigger money in 2019."

34. In numerous oral communications as well as in writing, via email, Mr. Elfus and the Defendants agreed that Mr. Elfus is due an increased percentage of fees emanating from those commissions collected by ISB from Mr. Leonard.

---

[5] *See* Ramona Shelburne and Michael C. Wright, "Inside the tension between Kawhi Leonard and the Spurs," ESPN, May 1, 2018 *at* http://www.espn.com/nba/story/_/id/23366667/inside-tension-kawhi-leonard-spurs ("**IN 2014, LEONARD** had a wrist injury that wasn't healing as anticipated, and his representatives, Frankel and Brian Elfus, asked for a second opinion . . . Spurs sources point to Elfus' departure in 2016 as a turning point in the relationship. He had maintained a strong relationship with the Spurs' front office and coaching staff and generally managed the relationship without incident . . . After Leonard and Elfus parted ways, Robertson and Frankel took over the day-to-day communication with the Spurs, and the relationship hasn't been nearly as healthy, according to Spurs sources.").

35. At a minimum, the numerous oral and written communications between Mr. Elfus and the Defendants serve as an admission by the Defendants that commissions are past due to Mr. Elfus.

36. If the ISB Agreement and/or any separate oral or written exchanges do not constitute valid, binding and enforceable contracts either based upon the numerous ambiguities and unintelligible language used therein as well as the course of conduct of the parties during their years' long relationship, then Messrs. Frankel and Elfus are required to evenly split the fees emanating from Mr. Leonard's contract with the San Antonio Spurs, per the 2015 SPAC and the NBPA Regulations Governing Player Agents. As such, Mr. Elfus would be entitled to a fee (half of the four percent (4%) commission) of $1,886,862.60 from the commissions received by the Defendants from Mr. Leonard alone, under the 2015 SPAC.

<u>ISB's Unjust Enrichment Resulting from Gains Directly Related to Mr. Elfus</u>

37. At a minimum, the total net revenue generated by basketball players and coaches for ISB that were attributable to Mr. Elfus amounts to $2,465,808.00. That assumes that financials provided by ISB to Mr. Elfus, without supporting documentation attached (despite it being requested by Mr. Elfus) are accurate, and Mr. Elfus refuses to assume the accuracy of the financials for the purpose of this litigation.

38. Throughout his six (6) year business relationship with ISB, Mr. Elfus generated over $5,000,000.00 in commissions.

39. Mr. Elfus' assets brought in to ISB in 2016-17 alone were approximately $1,040,000.00, not including any marketing fees, again assuming that financials provided by ISB to Mr. Elfus are accurate in order to create a minimum threshold for the purpose of this litigation.

40. In fact, the financials ISB provided to Mr. Elfus in December 2016 curiously differ in some material respect to the projections and financials that ISB provided to its potential investor in August 2015. One glaring omission from the December 2016 financials is any reference to fees received from Mr. Leonard, despite Mr. Leonard assuring Mr. Elfus in April 2018 that such commissions were paid by December 2016. As such, the legitimacy of the financials are disputed by Mr. Elfus.

41. Furthermore, Mr. Elfus' assignment of player agent fees from Tyrus Thomas at the inception of his business relationship with ISB, to the tune of $1,200,000.00, more than covered any monies ISB actually paid out to Mr. Elfus during the course of said business relationship, and not all of Mr. Elfus' salary due has been paid to date.

42. Assuming for the sake of argument that the ISB Agreement is valid and binding, and Mr. Elfus was only entitled to sixty percent (60%) of the total net revenue generated by him in the amount of $2,465,808.00, then Mr. Elfus would be owed $1,479,484.80. However, Mr. Elfus was entitled to seventy-five percent (75%) commission on certain clients, which means that Mr. Elfus is due and owed in excess of $1,479,484.80, and an even greater sum should the ISB Agreement be deemed invalid.

<u>ISB Seeks Infusion of Capital to Remain in Business</u>

43. IMPACT has been engaged in the business of representing professional athletes for more than twenty-five (25) years, but has had budgetary issues throughout.

44. Several lenders have provided investment capital to IMPACT over the years in order for IMPACT, and ISB, to remain in business.

45. One of the lenders that has provided investment capital to IMPACT over the years is Cobalt Sports Capital, LLC ("Cobalt"), which has loaned more money to IMPACT than any

other of IMPACT's creditors. Since 2012, Cobalt invested more than $4.7 million into IMPACT's business.

46. By late 2015, Mr. Frankel became engaged in negotiations with Mr. Joseph Sutton, his father Mr. Jeff Sutton and JS, for the sale and purchase of IMPACT and ISB to JS.

47. On March 14, 2016, Cobalt assigned to JS its right, title and interest in and to all of its collateral relating to IMPACT.

48. Additionally, Mr. Joseph Sutton and Mr. Jeff Sutton created J&J MM to be involved in the IMPACT and ISB sports businesses.

49. On September 19, 2016, Mr. Joseph Sutton and Mr. Jeff Sutton caused J&J MM to enter into an Employment Agreement with Andrew Thomas, an athlete recruiter, client services provider and "runner" (as the term is defined in the sports agent industry), who is domiciled in Aventura, Florida, with J&J MM holding itself out as being engaged in, among other things, the worldwide business of representing athletes in connection with their professional athletic and other endeavors, including promotional and marketing services. Mr. Thomas still refers to himself on his official LinkedIn page as being involved in Player/Basketball Operations at Impact Sports Management Group. J&J MM's sports business was IMPACT and ISB.

50. Mr. Jeff Sutton and Mr. Joseph Sutton are very educated and successful businesspeople. Upon information and belief, they were creating various shell companies, including J&J MM, to be involved in the sports businesses of IMPACT and ISB at least in part to shield themselves from debts owed to Mr. Elfus and others.

51. In 2016 or 2017, Mr. Joseph Sutton and his father Mr. Jeff Sutton, who is the billionaire founder of New York City-based Wharton Properties, invested, through JS, $10 million into IMPACT and/or ISB. Mr. Sutton's intention was to use IMPACT and ISB to build an agency

that was even more focused on representing basketball players, and his main desire was to represent Mr. Leonard.

52. Mr. Joseph Sutton has a primary residence in New York, New York, and serves as the Senior Managing Partner of Impact Sports Management, which he describes on his LinkedIn page as "a boutique sports agency and management firm that represents some of the most successful athletes in the industry" and describes his work as "overseeing all of the company's operations and playing a major role in the recruiting of High Profile clients." Mr. Joseph Sutton is a part owner of IMPACT and/or ISB.

53. Mr. Joseph Sutton, individually and through JS and J&J MM, has been involved in nearly every decision for ISB and IMPACT since JS' initial investment in the corporate entities, and has directed Mr. Elfus to perform certain kinds of work prior to Mr. Elfus' departure from ISB.

54. Prior to making an investment in IMPACT and/or ISB, Mr. Joseph Sutton, Mr. Jeff Sutton, J&J MM and JS were provided a copy of the ISB Agreement along with other agreements, which IMPACT and ISB deemed to be integral to IMPACT and ISB's overall business structure.

55. Upon information and belief, Mr. Joseph Sutton, Mr. Jeff Sutton and JS have caused player agent fees from Mr. Leonard and other basketball players to be diverted to an owned company separate and apart from ISB. Mr. Joseph Sutton, Mr. Jeff Sutton, J&J MM and JS have engaged in such efforts in order to try to escape creditors such as Mr. Elfus.

56. On August 23, 2017, Mr. Elliot H. Levine ("Mr. Levine") of Levine & Seltzer LLP, acting as Defendants' accountant, wrote to Mr. Peter R. Ginsberg, Esq. ("Mr. Ginsberg"), who has served as ISB's, IMPACT's and Mr. Frankel's legal counsel since 2010, that Mr. Elfus and

his attorney "should know that the entity Impact sports has no assets as the lender foreclosed on the receivables[.]" *See* **Exhibit "D"**.  Mr. Ginsberg responded, "I don't think that is accurate."[6]

57. Since investing in ISB and IMPACT, JS has directed much if not all of the revenues from basketball players to bank accounts in its or its affiliates/subsidiaries' names. These suspect conveyances cannot be used to deprive Mr. Elfus from monies that he is owed.

58. On August 26, 2017, Mr. Ginsberg wrote to Mr. Levine, "In contemplation of my conversations with Siegel's and Elfus' attorneys, you confirmed that, while the Impact deal has not closed, the Sutton entities (I am not sure of the identity of the entity involved but assume it is a new entity created for this purpose) own the debt formerly owned by Cobalt and therefore own the revenue stream. My understanding is that the Cobalt transaction essentially encompassed the purchase of the ISM revenue stream and that the ISM revenue stream is guaranteed by ISB's revenue stream. (Mitch formerly also personally guaranteed the Note but I gather that was released by the Sutton entities.) You also told me that UCCs have been filed on all the receivables." *See* **Exhibit "E"**.

59. Upon information and belief, and as referenced by Mr. Ginsberg in his correspondence as counsel for the Defendants, Mr. Jeff Sutton and Mr. Joseph Sutton have created various corporate entities (such as JS and J&J MM) for the purpose of engaging in sports businesses, including for the purpose of receiving fees emanating from clients represented by Mr. Elfus and assets of ISB and IMPACT. However, those entities may also include J&J Sports Agency, LLC, JS Holdings LLC and J&J Sports Agency Investor LLC, all named as defendants in a lawsuit brought by Peter R. Ginsberg Law, LLC in the Supreme Court of the State of New York County

---

[6] The communications between Mr. Ginsberg and any of the Defendants, as well as Mr. Levine, were all made public by Mr. Ginsberg and his law firm through his initiation of the case of *Peter R. Ginsberg, LLC v. J&J Sports Agency, LLC et al.,* pending in the Supreme Court of the State of New York, County of New York, Index No. 161430/2017, wherein Mr. Ginsberg's law firm seeks payment of monies past due for legal services provided to numerous individuals and entities, including JS.

of New York based on nonpayment of legal fees. As such, Mr. Elfus expressly reserves the right to add any and/or all of the aforementioned corporate entities as defendants in an amended complaint in order to recoup monies that are past due and may have been conveyed by Mr. Frankel, ISB, IMPACT, JS and/or J&J MM.

60. Since investing in ISB and IMPACT, JS has filed lawsuits against third parties on behalf of debts and obligations purportedly owed to ISB and IMPACT, including in the federal court case of *JS Sports Funding LLC v. Select Sports Group I, LLC et al.*, which was litigated in the U.S. District Court for the District of Colorado before being settled on December 22, 2016 (the "Select Sports Case")

61. JS, in the Complaint filed in the Select Sports Case, admitted that fees and commissions related to IMPACT player clients have been assigned to JS.

62. Mr. Ginsberg signed the Notification of Settlement in the Select Sports Case on behalf of JS.

63. Upon information and belief, another company known as "Worldwide Sports Marketing Company" had an account opened in its name and has been receiving deposits related to player agent fees owed by Mr. Leonard.

<u>Failed Efforts between Mr. Elfus and ISB to Resolve the Current Matter</u>

64. On May 5, 2017, Mr. Elfus, together with his affiliates, officers, directors, members, managers, predecessors, successors, and assigns, individually, jointly severally and collectively referred to as "BE" and ISB, which included IMPACT, entered into a "Tolling Agreement." The Tolling Agreement tolled the statutes of limitation for all claims, including BE's allegation of monies owed to BE from ISB that included, without limitation, money owed to BE relating to

Mr. Leonard, thereby avoiding commencement of a grievance or other legal proceedings while the parties attempted to engage in a settlement negotiation process.

65. BE and ISB were unsuccessful with regard to any settlement discussions during the pendency of the Tolling Agreement.

66. On April 17, 2018, Mr. Elfus, through legal counsel, sent a letter to Mr. Leonard that demanded unpaid agent fees based on the 2015 SPAC. The letter referenced an understanding that the entire commission for the first four years under the 2015 SPAC was paid to ISB in December 2016, none of which was ever remitted to Mr. Elfus outside an advance on commissions totaling a meager $44,000.00.

67. The April 17, 2018 letter to Mr. Leonard summarized NBPA policy, which is that co-agents on a SPAC are entitled to an equal share of commissions on a player's NBA contract.

68. On April 23, 2018, Mr. Ginsberg, indicating that he was responding on behalf of Mr. Leonard, confirmed that Mr. Leonard has paid all fees and commissions owed pursuant to his July 16, 2015 contract with the San Antonio Spurs and in accordance with the 2015 SPAC, and "in the manner in which Mr. Leonard has always paid such monies." Mr. Ginsberg's response was a clear acknowledgement that Mr. Leonard had made payments to the Defendants and that the Defendants had been and continue to illegally withhold monies due to Mr. Elfus under the 2015 SPAC and other relevant contractual arrangements, while fraudulently leading Mr. Elfus to believe that Mr. Leonard has not made agent fee payments under the 2015 SPAC.

69. Mr. Ginsberg further stated that if Mr. Elfus engages in a legal dispute with Mr. Leonard upon receiving knowledge that all fees have been paid to the Defendants, then "Mr. Leonard will pursue the appropriate relief with authorities of the NBPA who supervise the certification and

governance of agents." It is thus clear that Mr. Elfus' dispute lies with the recipient(s) of the commissions due to Mr. Elfus who have wrongfully withheld same from Mr. Elfus.

70. On May 9, 2018, BE, through the undersigned, informed Mr. Ginsberg that Heitner Legal, P.L.L.C. serves as legal counsel for BE and that, pursuant to Section 2 of the Tolling Agreement, BE was providing thirty (30) days' written notice to ISB of BE's intention to terminate the Tolling Date portion of the Tolling Agreement. The letter to Mr. Ginsberg was sent in compliance with Section 6(b) of the Tolling Agreement, which provided the notice requirement thereunder.

71. Mr. Ginsberg has experienced the same issues of non-payment from the Defendants as Mr. Elfus, and initiated a lawsuit against many of the named Defendants in the Supreme Court of the State of New York, County of New York, on December 27, 2017, alleging that Mr. Ginsberg and his law firm had consistently been told that his legal bills were being paid, and continued to provide legal services to IMPACT and ISB, despite receiving monies past due. According to Mr. Ginsberg, his law firm rendered legal services from 2014 through October 2016 that resulted in $675,689.33 in legal fees. *See* **Exhibit "F".**

72. Prior to the initiation of this lawsuit, Mr. Elfus came to a separate settlement agreement with Mr. Siegel, Elfus Sports Management, LLC, SiegelSports, Inc. and Elfus-Siegel Management ("ES Management"), which expressly provides Mr. Elfus the exclusive right to demand and retain from any party, including ISB (explicitly named in the settlement agreement) and/or an ISB-related entity or person, a past present or future fee, percentage and/or commission generated from Mr. Elfus' clients, including any monies due (or to become due) for Mr. Elfus' clients pursuant to the ISB Agreement. As such, Mr. Elfus has authority to bring this suit without the need to join or seek approval from Mr. Siegel or ES Management.

73. At all times relevant, the Defendants have refused to provide requested information and negotiate in good faith, including but not limited to failing to deliver requested documentation surrounding internal and unaudited financials provided to Mr. Elfus by the Defendants.

74. Mr. Elfus has retained the law firm of HEITNER LEGAL, P.L.L.C. to represent Mr. Elfus in this litigation.

## COUNT I – DECLARATORY JUDGMENT
(against ISB)

75. Plaintiff repeats and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

76. This count arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

77. There is a question as to whether the ISB Agreement is valid, binding and enforceable as between Mr. Elfus and ISB.

78. Mr. Elfus requests that this Court declare that the ISB Agreement is not a valid, binding and enforceable contract.

79. If the ISB is valid, binding and enforceable, then it is wholly unclear as to what the actual terms of the ISB Agreement are and what terms would affect Mr. Elfus' right to fees from the Defendants as a result of agent fees paid by numerous players, including but not limited to Mr. Leonard.

## COUNT II – BREACH OF CONTRACT (ISB AGREEMENT)
(against ISB, IMPACT, JS and J&J MM)

80. Plaintiff repeats and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein

81. Mr. Elfus and ISB entered into a contract that contained salary and commission compensation by ISB to Mr. Elfus as material elements. ISB has breached the ISB Agreement by underpaying Mr. Elfus his salary and failing to pay Mr. Elfus commissions past due.

82. Mr. Elfus performed all of his duties and obligations to ISB under the ISB Agreement.

83. Mr. Frankel, on multiple occasions, confirmed that he and ISB would pay Mr. Elfus the monies past due under the ISB Agreement.

84. JS assumed the responsibilities of ISB and the ISB Agreement upon purchasing IMPACT and ISB.

85. J&J MM has been completely involved in ISB's business, including but not limited to hiring ISB employees under its own corporate name, since JS assumed the responsibility of ISB and the ISB Agreement.

86. ISB further breached the ISB Agreement by failing to ask BE to offer input regarding the sale, assignment or pledge of the ISB Agreement or rights or obligations thereunder to JS or any other entity.

87. The Defendants have failed to pay Mr. Elfus the monies he is past due under the ISB Agreement.

88. The Defendants failed to receive approval or input from Mr. Elfus before incurring numerous expenses, many of which had absolutely nothing to do with Mr. Elfus or his business, in material breach of the ISB Agreement.

89. Defendants failed to jointly collect revenues from basketball players with Mr. Elfus, pocketing all of the monies received from players and withholding same from Mr. Elfus, which was a material breach of the ISB Agreement.

90. Mr. Elfus has suffered damages as a result of the breach.

**WHEREFORE**, Mr. Elfus is entitled to recover damages in an amount no less than $1,479,484.80 resulting from Defendants' breach of the ISB Agreement.

<u>COUNT III – BREACH OF CONTRACT (2015 SPAC)</u>
(against all Defendants)

91. Plaintiff repeats and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

92. On July 2, 2015, Mr. Leonard executed the 2015 SPAC, which named both Mr. Elfus and Mr. Frankel as the "Agent" who agreed to represent Mr. Leonard – to the extent requested by Mr. Leonard – in conducting individual compensation negotiations for the performance of Mr. Leonard's services as a professional basketball player with Mr. Leonard's NBA club.

93. On July 16, 2015, Mr. Leonard signed a 5-year, $94,343,130.00 contract with the San Antonio Spurs, which was negotiated by Mr. Elfus.

94. Under the 2015 SPAC, unless a separate written, executed agreement modifies the terms, Mr. Frankel and Mr. Elfus are to split the fees paid by Mr. Leonard for services performed pursuant to the 2015 SPAC, which includes a fee of the compensation received by Mr. Leonard for each playing season under the San Antonio Spurs contract.

95. Mr. Frankel has directed Mr. Leonard to send 100% of the aforesaid fees to himself, ISB, IMPACT, J&J MM and/or JS throughout the term of Mr. Leonard's contract with the San Antonio Spurs, causing a material breach to the 2015 SPAC, as his act has precluded Mr. Elfus from receiving his portion of the fees under the agreement.

96. Mr. Frankel has breached the 2015 SPAC by failing to pay Mr. Elfus the full amount due to Mr. Elfus for his performance on the 2015 SPAC and in negotiating the San Antonio Spurs contract on behalf of Mr. Leonard.

97. Mr. Elfus has been damaged as a result of this breach of contract by Mr. Elfus.

**WHEREFORE**, Mr. Elfus is entitled to recover damages in an amount no less than $1,886,862.60 resulting from Defendants' breach of the 2015 SPAC.

### COUNT IV – UNJUST ENRICHMENT
(against all Defendants)

98. Plaintiff repeats and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

99. This count seeks recovery for the value of the services provided by Mr. Elfus to the Defendants with regard to the basketball players that Mr. Elfus has recruited, maintained, represented and negotiated contracts for and on behalf of while working at ISB. This claim is brought in the alternative to Counts I, II and III in the event it is determined that Mr. Elfus does not have an adequate remedy at law for the matters alleged in those counts.

100. Mr. Elfus conferred a direct benefit on the Defendants when he recruited and represented basketball players as their agent of record and negotiated team contracts on their behalf in exchange for a commission of their team contracts.

101. Defendants voluntarily accepted and retained the benefit conferred.

102. Defendants have refused to pay Mr. Elfus for the services provided. On information and belief, the value of those services exceeds 5,000,000.00, with the exact amount to be proven at trial.

103. Circumstances are such that it would be inequitable for Defendants to retain the benefit without paying a portion of the commissions received from basketball players' contracts to Mr. Elfus for the valuable services he provided, which caused monies to flow from the players to the Defendants.

**WHEREFORE**, Mr. Elfus is entitled to recover damages in an amount no less than $5,000,000 resulting from the enrichment of Defendants.

## COUNT V – PROMISSORY ESTOPPEL
### (against all Defendants)

104. Plaintiff repeats and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

105. Prior to, subsequent to, and outside of the execution of the ISB Agreement and 2015 SPAC, Defendants represented to Mr. Elfus that if Mr. Elfus' clients were profitable, then Mr. Elfus would receive fair payment for them.

106. Mr. Elfus always told that the main terms of the ISB Agreement were applicable with regard to his compensation – that he would receive seventy-five percent (75%) of the commissions received by the Defendants on clients that were his prior to entering into business with the Defendants and sixty percent (60%) of the commissions received by the Defendants on clients that he represented and recruited after entering into business with the Defendants.

107. Defendants always indicated that the aforesaid commissions were to be owed to Mr. Elfus without respect to Defendants' business costs that had no bearing to Mr. Elfus' business, including but not limited to lines of credit taken out by the Defendants and employment agreements (separate from that of Mr. Elfus) entered into between Defendants and their employees.

108. Mr. Elfus was always told by Mr. Frankel that if Mr. Elfus' clients were profitable, then Mr. Elfus would get paid on them.

109. Subsequent to the execution of the ISB Agreement and 2015 SPAC, Defendants represented to Mr. Elfus that Mr. Elfus generated over $5,000,000.00 in commissions during his business relationship with ISB.

110. Subsequent to the execution of the ISB Agreement and 2015 SPAC, Defendants represented to Mr. Elfus that the total net revenue generated by basketball players and coaches

for ISB that were attributable to Mr. Elfus amounted to $2,465,808.00. That was based on financials provided by Defendants to Mr. Elfus.

111. It was reasonably foreseeable that Mr. Elfus, in continuing to work for Defendants and, particularly in continuing to service Mr. Leonard, acted in good faith reliance on Defendants' representations.

112. Mr. Elfus relied in good faith on Defendants' representations.

113. Mr. Elfus' reliance upon Defendants' promises caused harm to Mr. Elfus.

114. Injustice can only be avoided if Defendants' promises are enforced because, absent such enforcement, Defendants will be permitted to retain the benefits of Mr. Elfus' labor and other rights to profits that have been promised and guaranteed to Mr. Elfus from the basketball players he has represented without having to pay for same.

**WHEREFORE**, Mr. Elfus respectfully requests this Court enter judgment against Defendants, jointly and severally, for all damages in an amount no less than $1,479,484.80, attorneys' fees, costs and interest, and such other relief as this Court deems just.

## COUNT VI – FRAUDULENT MISREPRESENTATIONS
### (against all Defendants)

115. Plaintiff repeats and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

116. Defendants made a series of false statements and omissions to Mr. Elfus. Specifically, Defendants misrepresented or omitted the fact that Mr. Leonard had been making timely payments to Defendants under the 2015 SPAC.

117. Instead of telling Mr. Elfus the truth, that Mr. Leonard had paid Defendants the full amount owed under the 2015 SPAC, Defendants claimed that they had not received monies due

under the 2015 SPAC and further provided Mr. Elfus with "accountings" that failed to include any documentation of any monies received under the SPAC.

118. Defendants knew or should have known that these representations were false when made.

119. Defendants intended for Mr. Elfus to rely on these misrepresentations, and Mr. Elfus did, in fact, rely on the misrepresentations to his detriment.

120. Mr. Elfus waited to take action for monies owed against Defendants based on these misrepresentations, and it is believed that the Defendants may now be or soon be insolvent. Further, it is believed that the Defendants may be fraudulently conveying to third parties' the monies owed to Mr. Elfus.

121. Mr. Frankel always said that ISB and IMPACT were not profitable and that Mr. Elfus would be paid if Mr. Leonard paid fees owed.

122. Mr. Leonard has since told Mr. Elfus that he paid all of the monies owed under the 2015 SPAC to the Defendants.

123. Mr. Elfus has been damaged as a direct and proximate result of Defendants' actions.

   **WHEREFORE**, Mr. Elfus demands judgment against Defendants jointly and severally, for compensatory damages in an amount no less than $1,479,484.80, attorneys' fees, costs and interest, and for such other relief as this Court deems proper.

## COUNT VII – FLSA
(against all Defendants)

124. Plaintiff repeats and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

125. At all times material hereto, Defendants regularly held and/or exercised the authority to hire and fire employees of ISB, as confirmed by the ISB Agreement.

126. At all times material hereto, Defendants regularly held and/or exercised the authority to determine the work schedules for the employees of ISB.

127. At all times material hereto, Defendants regularly held and/or exercised the authority to control the finances and operations of ISB.

128. Based on regularly holding and/or exercising the authority to (a) hire and fire employees of ISB; (b) determine the work schedules for the employees of ISB; and (c) control the finances and operations of ISB, Defendants are considered employers as defined by 29 U.S.C. 201 *et. seq.*

129. At all times material hereto, Mr. Elfus was "engaged in commerce" within the meaning of §6 and §7 of the FLSA, subject to individual coverage of the FLSA and providing services in commerce.

130. At all times material hereto, Mr. Elfus was an "employee" of Defendants within the meaning of the FLSA.

131. At all times material hereto, Defendants were an "employer" within the meaning of the FLSA.

132. At all times material hereto, ISB, IMPACT, J&J MM and JS were, and continue to be, "an enterprise engaged in commerce," within the meaning of the FLSA.

133. At all times material hereto, the work performed by Mr. Elfus was directly essential to the business performed by the Defendants.

134. Defendants hired Mr. Elfus to work as a salaried employee, paid based on an annual salary with regularly made payments throughout the year and with recognition that Mr. Elfus' "Compensation may be subject to W2 related tax withholding," per the ISB Agreement.

135. Mr. Elfus was, in fact, paid a salary, completely controlled by his employer with regard to which athletes Mr. Elfus was supposed to and allowed to recruit for the Defendants, how to

recruit said athletes, how much money he was allowed to spend on recruiting potential clients, where he was allowed to travel and how monies from the clientele were to be sent as well as the methodology with regard to distributions.

136. Defendants engaged in a pattern of untimely payments to Mr. Elfus for work Mr. Elfus performed for Defendants. As such, Mr. Elfus accumulated hours he worked, for which he was not paid.

137. Mr. Elfus is also seeking attorneys' fees and costs pursuant to the FLSA.

138. Prior to the filing of this lawsuit, Defendants did not consult with the Department of Labor to evaluate whether Mr. Elfus' actual job duties and pay structure rendered him exempt from recovering payment as an employee and subject to withholding under the FLSA.

139. Prior to the filing of this lawsuit, Defendants did not consult with an attorney to evaluate whether Mr. Elfus' actual job duties and pay structure rendered him exempt from recovering payment as an employee and subject to withholding under the FLSA.

140. Prior to the filing of this lawsuit, Defendants did not consult with an accountant to evaluate whether Mr. Elfus' actual job duties and pay structure rendered him exempt from recovering payment as an employee and subject to withholding under the FLSA.

141. Based on the allegations in the preceding three (3) paragraphs, Mr. Elfus is entitled to liquidated damages, as Defendants have no objective or subjective good faith belief that their pay practices were in compliance with the FLSA, and the ISB Agreement itself is an admission to a belief that Mr. Elfus was an employee, as it contemplates that Mr. Elfus may be subject to tax withholding as a W2 employee.

**WHEREFORE**, Mr. Elfus respectfully requests this Court enter judgment against Defendants, jointly and severally, for all outstanding unpaid wages, liquidated damages, attorneys' fees, costs and interest, and such other relief as this Court deems just.

## DEMAND FOR JURY TRIAL

Mr. Elfus demands trial by jury on all issues so triable as a matter of right by jury.

DATED this 11th day of June 2018.

**HEITNER LEGAL, P.L.L.C**
*Attorney for Plaintiff*
215 Hendricks Isle
Fort Lauderdale, FL 33301
Phone: 954-558-6999
Fax: 954-927-3333

By:

DARREN A. HEITNER
Florida Bar No.: 85956
Darren@heitnerlegal.com