UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO.: 9:18-cv-80752-BB

BRIAN ELFUS,

       Plaintiff,

v.

IMPACT SPORTS BASKETBALL LLC,
IMPACT – A SPORTS MANAGEMENT
CORPORATION, JS SPORTS FUNDING
LLC and J&J SPORTS AGENCY MM LLC

       Defendants.
_____/

## FIRST AMENDED COMPLAINT & DEMAND FOR JURY TRIAL

Plaintiff, Brian Elfus, by and through undersigned counsel, files this First Amended Complaint against Defendants IMPACT SPORTS BASKETBALL LLC, IMPACT – A SPORTS MANAGEMENT CORPORATION, JS SPORTS FUNDING LLC and J&J SPORTS AGENCY MM LLC and states as follows:

## OVERVIEW

Brian Elfus, a veteran sports agent, was chosen among hundreds of National Basketball Players' Association certified player agents to be the representative of college basketball standout Kawhi Leonard as Leonard transitioned from being a college basketball star to an NBA player in 2011. Leonard, who was only 19-years-old at the time, put his trust in Elfus to be his fiduciary in negotiating his professional contracts as well as take care of his business pursuits off the court. Elfus remained Leonard's agent for many years and included Impact Sports Basketball owner Mitch Frankel on Leonard's Standard Player Agent Contract. This Complaint emanates

from the wrongful deprivation of agent fees due to Elfus by Impact Sports Basketball, a related corporate entity and investors named herein, which include the agent fees derived from Leonard as well as other professional basketball players and coaches. In total, Elfus generated over $5,000,000.00 in commissions during the six years of his business relationship with Impact Sports Basketball, and other than receipt of a bi-monthly salary, separate and apart from monies due in the form of commissions, Elfus was not compensated accordingly. Elfus is entitled to commissions either (1) per a contractual agreement drafted by Impact Sports Basketball; or (2) based on modifications made to the agreement based on the express written consent of the parties.

## PARTIES

1. Plaintiff, Brian Elfus ("Mr. Elfus"), has a primary residence in San Diego County, California, and is an experienced sports agent and basketball industry veteran who currently serves as the President of Elfus Sports Management and is a player agent with the National Basketball Players' Association ("NBPA").

2. Defendant, Impact Sports Basketball, was incorporated in the State of Florida in 2010 and is currently an active limited liability company, doing business in the State of Florida, with a principal address of 2401 N.W. Boca Raton Blvd, #200, Boca Raton, FL 33431 and a mailing address of 21218 St. Andrews Blvd, #302, Boca Raton, FL 33433 ("ISB"). Mitchell Frankel ("Mr. Frankel"), an individual, is the sole Manager of ISB and a certified Player Agent with the NBPA.

3. Defendant, IMPACT – A Sports Management Corporation, was incorporated in the State of Florida in 1994 and is currently an active corporation with a principal address of Impact Sports Management, 2401 N.W. Boca Raton Blvd, #200, Boca Raton, FL 33431 and a mailing

address of 21218 St. Andrews Blvd, #302, Boca Raton, FL 33433 ("IMPACT"). Mr. Frankel is listed as the "PVTC" of IMPACT with the Florida Division of Corporations.

4. Defendant, JS SPORTS FUNDING LLC ("JS"), is a New York corporation with its principal place of business located at 500 Fifth Avenue, New York, New York 10036. It is a creditor to IMPACT and an affiliated entity STMR, LLC ("STMR") and recipient of fees related to agent commissions paid by professional athletes based on the negotiation of their playing contracts. Upon information and belief JS is either affiliated with or the alter ego of J&J Sports Agency, LLC, JS Holdings LLC, J&J Sports Agency Investor LLC and/or all owned and managed by Mr. Jeff Sutton and Mr. Joseph Sutton.

5. Defendants, J&J SPORTS AGENCY MM LLC ("J&J MM"), is a Delaware limited liability company with its principal place of business at 500 Fifth Avenue, New York, New York 10036, and is either doing business with JS or is the alter ego of JS. Upon information and belief, J&J MM is owned and managed by Mr. Jeff Sutton and Mr. Joseph Sutton.

## JURISDICTION AND VENUE

6. This action is a civil action over which this Court has original jurisdiction under 28 U.S.C. § 1332(a), because there is diversity of citizenship among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of costs and attorneys' fees. The Plaintiff is not a citizen of Florida and there is complete diversity between the parties under 28 U.S.C. § 1332.

7. Pursuant to Fla. Stat. § 48.193, this Court has personal jurisdiction over IMPACT, ISB, JS and J&J MM, because at all relevant times they conducted, engaged in, and carried on business in Florida, and were registered to transact business in Florida, and maintained an office in Palm Beach County, Florida.

8. The December 15, 2010 "Term Sheet/Agreement" between Mr. Elfus and ISB is a material element of the dispute. Said document indicates that it "shall be governed by and construed as to the validity, enforcement, interpretation, construction, effect and in all other aspects by the laws of the State of Florida." Further, venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) and (c), as this controversy arises in this district where Defendants' wrongful actions have occurred and where at all relevant times Defendants regularly conducted business.

9. This is not a dispute that is subject to the NBPA Regulations Governing Player Agents (the "NBPA Regulations") nor its internal dispute resolution procedure, as the NBPA Regulations did not contain any language providing that player agents be compelled to mandatory arbitration during the period under which this dispute originally arose.

10. All conditions precedent to the filing of this action have been satisfied, have been performed or have been waived.

## GENERAL ALLEGATIONS

### Mr. Elfus Enters Into a Business Relationship with ISB and IMPACT

11. On December 15, 2010, Mr. Elfus and Michael Siegel ("Mr. Siegel") entered into what was titled as a "Term Sheet/Agreement" with ISB wherein ISB guaranteed Mr. Elfus an annual salary, an annual budget to cover business-related expenses and professional basketball player contract-related commissions that Mr. Elfus was to share with Mr. Siegel (attached hereto as **Exhibit "A"** and referred to herein as the "ISB Agreement").

12. Upon information and belief, ISB commingled assets and liabilities with IMPACT, the latter entity serving as a type of parent company for all of the sports divisions (such as basketball and football) operated by Mr. Frankel. Furthermore, monies collected by JS and J&J MM as

player agent fees (which Mr. Elfus is partially entitled to receive) have and will continue to be received from IMPACT.

13. Throughout the term of the ISB Agreement, monies that were to be shared by ISB and Mr. Elfus were often accepted and deposited by IMPACT, and ISB expenses were often incurred by IMPACT. Furthermore, as explained below, the ISB Agreement was later assigned to JS and its related J&J MM corporate entity by IMPACT, and therefore all of the duties and obligations contained in the ISB Agreement were assumed by those corporate entities as well.

14. On or around the date of the ISB Agreement, Mr. Elfus assigned his $1,200,000.00 player agent commission from NBA player Tyrus Thomas to ISB, which immediately infused ISB with liquidity and covered Mr. Elfus' salary payments for years to come.

15. The salary paid by ISB to Mr. Elfus was irrespective of ISB's obligation to jointly collect agent commissions from players and Mr. Elfus' right to a portion of the player agent commissions received.

16. The ISB Agreement required that ISB pay Mr. Elfus a commission of seventy-five percent (75%) on profits derived by ISB from clients that Mr. Elfus represented prior to December 15, 2010, including but not limited to Tyrus Thomas, and sixty percent (60%) on profits derived by ISB from clients to be secured by Mr. Elfus after December 15, 2010. Defendants breached the ISB Agreement by failing to provide Mr. Elfus the aforesaid commissions and failed to account to Mr. Elfus for the commissions it received from basketball players represented by Mr. Elfus.

17. It was understood that Mr. Elfus had come to his own arrangement with Mr. Siegel as to how each Mr. Elfus and Mr. Siegel would share in the professional basketball contract-related commissions received from ISB and, subsequent to Mr. Elfus' employment with ISB, Mr. Elfus

entered into a settlement agreement with Mr. Siegel that specifically breaks down any fees Mr. Elfus would owe Mr. Siegel based on the outcome of this instant dispute.

18. The aforesaid respective seventy-five percent (75%) and sixty percent (60%) commissions were to be paid out to Mr. Elfus after Mr. Elfus reimbursed ISB $22,220.15, which Mr. Elfus acknowledged as a debt and which Mr. Elfus soon thereafter provided to ISB, extinguishing the debt completely. The ISB Agreement also included derivations of the standard seventy-five percent (75%) and sixty percent (60%) splits in profit, which are identified in Section VII of the ISB Agreement. Defendants breached the ISB Agreement by failing to pay Mr. Elfus the commissions that he was due under the ISB Agreement.

19. The ISB Agreement, per the first bullet point in Section VIII, required ISB and Mr. Elfus to classify all existing and future clients, as well as determine their correspondent applicable professional basketball contract-related commission splits, in good faith. Defendants breached the ISB Agreement by failing to classify the clients attributable to Mr. Elfus and by failing to provide Mr. Elfus with their correspondent applicable professional basketball contract-related commission splits or provide Mr. Elfus with any accountings, certified or otherwise, to explain why and how commission splits were accounted for.

20. Further, the ISB Agreement specifies, in the final bullet point of Section VIII, that the collection of revenues from represented professional basketball players was to be "jointly performed by the Parties in good faith." This provision was breached based on Defendants never allowing Mr. Elfus to be at all involved in the collection of revenues, and the ISB Agreement has been further breached based on Defendants failing to even provide an accounting to Mr. Elfus or deliver those revenues belonging to Mr. Elfus under the ISB Agreement and all relevant Standard Player Agent Contracts.

21. The ISB Agreement also required Defendants to receive input from Mr. Elfus before incurring any expenses, in good faith, regarding any accounting attributable to a player, as stated in multiple instances in the ISB Agreement. However, Defendants failed in this regard, which was another breach of the ISB Agreement. For example[1], the Defendants never sought or received input from Mr. Elfus (or since provided substantiation) prior to:

   a. Defendants placing Mr. Leonard's uncle and mother on ISB's payroll for at least the last five (5) years;

   b. Spending significant and unnecessary monies on a series of incidents of waste and possible criminal behavior that went unchecked and unsupervised at ISB, including but not limited to the actions of Carlos Dew[2] and Deondre Boynton;

   c. Incurring a curious expenditure of $360,000 for a particular client during the 2016 NBA Draft workouts;

   d. Making payments to a "KL3" for $17,741.35 and "KL4" for $16,189.62[3];

   e. Incurring expenses of $429,822.87 cumulative to basketball players Terrico White, Alex Young, Dexter Pittman and Jarvis Varnado;

   f. Incurring expenses of $74,090.94 for basketball player Sir'Dominic Pointer;

   g. Incurring expenses of $338,805.00 for basketball player Will Barton;

   h. Incurring expenses of $34,116.83 for basketball player Isaiah Cousins;

---

[1] There are many more examples not included herein.

[2] *See* Mark Burns, "Report: Impact Sports Basketball Suffers Setback," Sports Agent Blog, June 17, 2014, *at* http://sportsagentblog.com/2014/06/17/report-impact-sports-basketball-suffers-setback/ ("Impact recently lost one of its top recruiters in Carlos Dew, according to a source close to the situation. According to the source, Impact Basketball fired Dew because he allegedly stole money and clients from Impact.").

[3] Upon information and belief, "KL" is an abbreviation for Kawhi Leonard, but Mr. Elfus is unaware as to the meaning of the numbers attached to each abbreviation.

     i.    Incurring expenses of $407,451.39 for basketball player Tyrus Thomas;

     j.    Incurring expenses of $20,058.91for basketball player Thomas Robinson;

     k.    Incurring expenses of $37,326.78 for basketball player Terrel Harris; and

     l.    Incurring expenses of $22,857.49 for basketball player Elliot Williams.

22. Despite the myriad expenses that ISB incurred, most of which were incurred without Mr. Elfus' input, Mr. Elfus was always told by Mr. Frankel that if Mr. Elfus' clients were profitable, then Mr. Elfus would get paid on them. However, Mr. Elfus received no specific commissions for six (6) years working as an employee at ISB, though bi-monthly unallocated payments were made, despite assigning the $1,200,000.00 player agent commission from Tyrus Thomas at the inception of their relationship. The failure to allow Mr. Elfus to be involved in the collection of revenues from basketball player clients as well as pay Mr. Elfus any specific commissions is the most material breach of the ISB Agreement by the Defendants.

23. A proper accounting is necessary to determine the extent of the damage caused to Mr. Elfus based on the number of players represented by Mr. Elfus and the significant commissions received by the Defendants from players including but not limited to Mr. Leonard and Mr. Barton.

24. The aforesaid bi-monthly unallocated payments were made under the ISB Agreement, whereby ISB promised to pay Mr. Elfus a minimum of an $80,000.00 salary and provide Mr. Elfus with $40,000.00 to reimburse business-related expenses during each year that Mr. Elfus was employed by ISB. ISB, in the ISB Agreement, acknowledged that Mr. Elfus' salary and expense budget "shall be determined in good faith by the Parties during each ISB Year and reviewed and adjusted as necessary by the Parties throughout each ISB Year to consider changes" in the revenue brought in by Mr. Elfus as well as "market circumstances and

conditions." Defendants only made those bi-monthly unallocated payments to Mr. Elfus (sometimes coming from ISB and sometimes coming from IMPACT), below the amounts promised, and did not provide Mr. Elfus any separate commissions. Again, this was a breach of the ISB Agreement by the Defendants, since Mr. Elfus was entitled to a percentage of ISB Profits, as defined in the ISB Agreement.

25. Defendants were required, pursuant to Section IV of the ISB Agreement, to implement applicable adjustments to Mr. Elfus' budget on or before February 28, April 30, June 1, October 31 and December 31 of every year; however, it failed with regard to this obligation, which served as a breach of the ISB Agreement.

<u>Kawhi Leonard Becomes a Client of Messrs. Elfus and Frankel</u>

26. On April 14, 2011, the now two-time NBA All-Star, two-time All-NBA First Team and 2014 NBA Champion, Kawhi Leonard ("Mr. Leonard") declared for the 2011 NBA Draft after his sophomore season at San Diego State University and indicated that he would not return to school, as he intended to soon thereafter hire an NBPA certified player agent.

27. While many agents solicited Mr. Leonard, he did not take long to determine that Mr. Elfus was the right choice and entered into a Standard Player Agent Contract that directed NBA teams to speak to and negotiate with Mr. Elfus as Mr. Leonard's player agent.

28. Mr. Elfus was a zealous advocate for Mr. Leonard on and off the basketball court throughout his representation of Mr. Leonard.

29. As Mr. Leonard's fiduciary, Mr. Elfus not only ensured that Mr. Leonard maintained a squeaky clean reputation, but also assisted in negotiating (i) a four-year $8.3 million contract with the San Antonio Spurs; (ii) marketing deals with Jordan Brand, BBVA, and Wingstop; and

(iii) most notably, a contract on July 16, 2015 that would guarantee Mr. Leonard almost $100 million.

30. On July 2, 2015, prior to signing the roughly $100 million contract, Mr. Leonard executed a new Standard Player Agent Contract naming Messrs. Elfus and Frankel as his player agents and agreeing to pay a four percent (4%) commission to his player agents for contracts negotiated, under the 2015 SPAC (attached hereto as **Exhibit "B"** and referring to herein as the "2015 SPAC").

31. On July 16, 2015, Mr. Leonard signed an agreement with the San Antonio Spurs that guaranteed him $94,343,130.00 over a five-year span, and which included an agent certification form attached thereto that was executed by Messrs. Elfus and Frankel as Mr. Leonard's player agents who assisted in the negotiation of Mr. Leonard's contract with the Spurs (attached hereto as **Exhibit "C"**).

32. While Mr. Frankel was also listed on the 2015 SPAC and the agent certification form, it was Mr. Elfus who masterfully handled Mr. Leonard's negotiation with the San Antonio Spurs.[4]

33. San Antonio Spurs general manager R.C. Buford wrote to Mr. Elfus after Mr. Leonard's most recent contract negotiations to thank him for working with the organization to "keep Kawhi a part of our family for years to come," recognizing Mr. Elfus' integral role in negotiating Mr. Leonard's contract with the Spurs.

---

[4] *See* Ramona Shelburne and Michael C. Wright, "Inside the tension between Kawhi Leonard and the Spurs," ESPN, May 1, 2018 *at* http://www.espn.com/nba/story/_/id/23366667/inside-tension-kawhi-leonard-spurs ("**IN 2014, LEONARD** had a wrist injury that wasn't healing as anticipated, and his representatives, Frankel and Brian Elfus, asked for a second opinion . . . Spurs sources point to Elfus' departure in 2016 as a turning point in the relationship. He had maintained a strong relationship with the Spurs' front office and coaching staff and generally managed the relationship without incident . . . After Leonard and Elfus parted ways, Robertson and Frankel took over the day-to-day communication with the Spurs, and the relationship hasn't been nearly as healthy, according to Spurs sources.").

34. Mr. Elfus' artful negotiation skills and advocacy on behalf of Mr. Leonard was recognized by many, including but not limited to Mark Zeigler of the *San Diego Union-Tribune*, who noted in an October 27, 2015 article titled, "Kawhi Leonard: A rich man, not a changed man," that "[Mr. Leonard] makes $18.8 million per year and, thanks to a clause negotiated into the contract by [Brian] Elfus, could become eligible for unrestricted free agency and even bigger money in 2019."

35. Commissions emanating from Mr. Leonard are well past due to Mr. Elfus.

36. Mr. Frankel wrote to Mr. Elfus, in an email dated August 28, 2015, that "Under the existing agreement, you are entitled to a certain percentage of commissions regarding clients of ISB. Kawhi Leonard is one of those clients . . . In the event that he pays the first three years in December 2015, you would be due a distribution at that time." *See* **Exhibit "D"**. This was an admission by Mr. Frankel, on behalf of ISB, that monies were at least due to Mr. Elfus from Mr. Leonard's commissions.

37. Additionally, the email from Mr. Frankel expressly tied the ISB Agreement commissions to IMPACT by stating, "This [ISB] agreement has been provided to the potential investors along with other agreements which are integral to Impact Sports' overall business structure." *See* **Exhibit "D"**.

38. Furthermore, the email from Mr. Frankel serves as an admission that financial obligations to ISB were to be assigned to an investor (i.e. JS and J&J MM) and therefore they would be bound by the terms of the ISB Agreement as well, when Mr. Frankel wrote, "The investment proposals that are pending address not only Kawhi's financial obligations to ISB but also other clients as well." *See* **Exhibit "D"**.

Projecting Damages Without Access to Authentic Accounting of Proper Assets and Liabilities

39. At a minimum, the total net revenue generated by basketball players and coaches for Defendants that were attributable to Mr. Elfus amounts to $2,465,808.00. That assumes that financials provided by Defendants to Mr. Elfus, without supporting documentation attached (despite it being requested by Mr. Elfus) are accurate, and Mr. Elfus refuses to assume the accuracy of the financials for the purpose of this litigation.

40. Throughout his six (6) year business relationship with ISB, Mr. Elfus generated over $5,000,000.00 in commissions from represented professional basketball players.

41. Mr. Elfus' assets brought in to ISB for Defendants in 2016-17 alone were approximately $1,040,000.00, not including any marketing fees, again assuming that financials provided by Defendants to Mr. Elfus are accurate in order to create a minimum threshold for the purpose of this litigation.

42. In fact, the financials Defendants provided to Mr. Elfus in December 2016 curiously differ in some material respect to the financials that ISB and IMPACT provided to JS and J&J MM in August 2015. One glaring omission from the December 2016 financials is any reference to fees received from Mr. Leonard, despite Mr. Leonard assuring Mr. Elfus in April 2018 that such commissions were paid by December 2016. As such, the legitimacy of the financials are disputed by Mr. Elfus.

43. Furthermore, Mr. Elfus' assignment of player agent fees from Tyrus Thomas at the inception of his business relationship with ISB, to the tune of $1,200,000.00, more than covered any monies Defendants actually paid out to Mr. Elfus during the course of said business relationship, and not all of Mr. Elfus' salary due has been paid to date.

44. Assuming for the sake of argument that Mr. Elfus was only entitled to sixty percent (60%) of the total net revenue generated by him in the amount of $2,465,808.00, then Mr. Elfus

would be owed $1,479,484.80. However, Mr. Elfus was entitled to seventy-five percent (75%) commission on certain clients, which means that Mr. Elfus is due and owed in excess of $1,479,484.80 by the Defendants.

<u>ISB and IMPACT Seek Infusion of Capital to Remain in Business</u>

45. IMPACT has been engaged in the business of representing professional athletes for more than twenty-five (25) years, but has had budgetary issues throughout.

46. Several lenders have provided investment capital to IMPACT over the years in order for IMPACT, and ISB, to remain in business. Upon information and belief, monies received by IMPACT were used to fund ISB's business as well.

47. One of the lenders that has provided investment capital to IMPACT over the years is Cobalt Sports Capital, LLC ("Cobalt"), which has loaned more money to IMPACT than any other of IMPACT's creditors. Since 2012, Cobalt invested more than $4.7 million into IMPACT's business, monies that IMPACT shared with ISB.

48. In return for Cobalt's investment, IMPACT provided Cobalt with a security interest in receivables and other security documents related to IMPACT, including but not limited to the ISB Agreement despite IMPACT not being a named party to the ISB Agreement.

49. On March 14, 2016, Cobalt assigned to JS its right, title and interest in and to all of its collateral relating to IMPACT and ISB.

50. Additionally, Mr. Joseph Sutton and Mr. Jeff Sutton created J&J MM to be involved in the IMPACT and ISB sports businesses.

51. Mr. Jeff Sutton and Mr. Joseph Sutton are very educated and successful businesspeople. Upon information and belief, they were creating various shell companies, including J&J MM, to

be involved in the sports businesses of IMPACT and ISB at least in part to shield themselves from debts owed to Mr. Elfus and others.

52. Mr. Joseph Sutton, individually and through JS and J&J MM, has been involved in nearly every decision for ISB and IMPACT since JS purchasing the collateral from Cobalt relating to IMPACT and ISB, and has directed Mr. Elfus to perform certain kinds of work prior to Mr. Elfus' departure from ISB.

53. Prior to purchasing the collateral from Cobalt relating to IMPACT and ISB, Mr. Joseph Sutton, Mr. Jeff Sutton, J&J MM and JS were provided a copy of the ISB Agreement along with other agreements, which IMPACT and ISB deemed to be integral to IMPACT and ISB's overall business structure.

54. Pursuant to the assignment that JS received from Cobalt related to the receivables of ISB and IMPACT, all amounts owed by ISB and/or IMPACT to Mr. Elfus are accordingly owed by JS and/or any other corporate entity or individual that JS has directed money to in the form of commissions rightfully due to Mr. Elfus, including but not limited to J&J MM.

55. Upon information and belief, Mr. Joseph Sutton, Mr. Jeff Sutton and JS have caused player agent fees from Mr. Leonard and other basketball players to be diverted to an owned company separate and apart from ISB. Mr. Joseph Sutton, Mr. Jeff Sutton, J&J MM and JS have engaged in such efforts in order to try to escape creditors such as Mr. Elfus.

56. On August 23, 2017, Mr. Elliot H. Levine ("Mr. Levine") of Levine & Seltzer LLP, acting as Defendants' accountant, wrote to Mr. Peter R. Ginsberg, Esq. ("Mr. Ginsberg"), who has served as ISB's, IMPACT's and Mr. Frankel's legal counsel since 2010, that Mr. Elfus and his attorney "should know that the entity Impact sports has no assets as the lender foreclosed on

the receivables[.]" *See* **Exhibit "E"**. Mr. Ginsberg responded, "I don't think that is accurate."[5] This shows that IMPACT is a necessary party to this litigation, as assets it still possesses are owed to Mr. Elfus.

57. Since purchasing the collateral from Cobalt relating to IMPACT and ISB, JS has directed much if not all of the revenues from basketball players to bank accounts in its or its affiliates/subsidiaries' names. These suspect conveyances cannot be used to deprive Mr. Elfus from monies that he is owed.

58. On August 26, 2017, Mr. Ginsberg wrote to Mr. Levine, "In contemplation of my conversations with Siegel's and Elfus' attorneys, you confirmed that, while the Impact deal has not closed, the Sutton entities (I am not sure of the identity of the entity involved but assume it is a new entity created for this purpose) own the debt formerly owned by Cobalt and therefore own the revenue stream. My understanding is that the Cobalt transaction essentially encompassed the purchase of the ISM revenue stream and that the ISM revenue stream is guaranteed by ISB's revenue stream. (Mitch formerly also personally guaranteed the Note but I gather that was released by the Sutton entities.) You also told me that UCCs have been filed on all the receivables." *See* **Exhibit "F"**. This correspondence further makes it clear that IMPACT (a.k.a. ISM) and ISB are completely tied to each other and are each necessary parties for the purpose of this litigation.

59. Upon information and belief, and as referenced by Mr. Ginsberg in his correspondence as counsel for the Defendants, Mr. Jeff Sutton and Mr. Joseph Sutton have created various corporate entities (such as JS and J&J MM) for the purpose of engaging in sports businesses,

---

[5] The communications between Mr. Ginsberg and any of the Defendants, as well as Mr. Levine, were all made public by Mr. Ginsberg and his law firm through his initiation of the case of *Peter R. Ginsberg, LLC v. J&J Sports Agency, LLC et al.,* pending in the Supreme Court of the State of New York, County of New York, Index No. 161430/2017, wherein Mr. Ginsberg's law firm seeks payment of monies past due for legal services provided to numerous individuals and entities, including JS.

including for the purpose of receiving fees emanating from clients represented by Mr. Elfus and assets of ISB and IMPACT. However, those entities may also include J&J Sports Agency, LLC, JS Holdings LLC and J&J Sports Agency Investor LLC, all named as defendants in a lawsuit brought by Peter R. Ginsberg Law, LLC in the Supreme Court of the State of New York County of New York based on nonpayment of legal fees. As such, Mr. Elfus expressly reserves the right to add any and/or all of the aforementioned corporate entities as defendants in an amended complaint in order to recoup monies that are past due and may have been conveyed by Mr. Frankel, ISB, IMPACT, JS and/or J&J MM.

60. Since purchasing the collateral from Cobalt relating to IMPACT and ISB, JS has filed lawsuits against third parties on behalf of debts and obligations purportedly owed to ISB and IMPACT, including in the federal court case of *JS Sports Funding LLC v. Select Sports Group I, LLC et al.*, which was litigated in the U.S. District Court for the District of Colorado before being settled on December 22, 2016 (the "Select Sports Case").

61. JS, in the Complaint filed in the Select Sports Case, admitted that fees and commissions related to IMPACT player clients have been assigned to JS. This proves that JS is a necessary party for the purpose of this litigation.

62. Mr. Ginsberg signed the Notification of Settlement in the Select Sports Case on behalf of JS.

63. Upon information and belief, another company known as "Worldwide Sports Marketing Company" had an account opened in its name and has been receiving deposits related to player agent fees owed by Mr. Leonard.

<u>Failed Efforts between Mr. Elfus and ISB to Resolve the Current Matter</u>

64. On May 5, 2017, Mr. Elfus, together with his affiliates, officers, directors, members, managers, predecessors, successors, and assigns, individually, jointly severally and collectively referred to as "BE" and ISB, which included IMPACT, entered into a "Tolling Agreement." The Tolling Agreement tolled the statutes of limitation for all claims, including BE's allegation of monies owed to BE from ISB that included, without limitation, money owed to BE relating to Mr. Leonard, thereby avoiding commencement of a grievance or other legal proceedings while the parties attempted to engage in a settlement negotiation process.

65. BE and Defendants were unsuccessful with regard to any settlement discussions during the pendency of the Tolling Agreement.

66. On April 17, 2018, Mr. Elfus, through legal counsel, sent a letter to Mr. Leonard that demanded unpaid agent fees based on the 2015 SPAC. The letter referenced an understanding that the entire commission for the first four years under the 2015 SPAC was paid to ISB in December 2016, none of which was ever remitted to Mr. Elfus outside an advance on commissions totaling a meager $44,000.00.

67. The April 17, 2018 letter to Mr. Leonard summarized NBPA policy, which is that co-agents on a SPAC are entitled to an equal share of commissions on a player's NBA contract.

68. On April 23, 2018, Mr. Ginsberg, indicating that he was responding on behalf of Mr. Leonard, confirmed that Mr. Leonard has paid all fees and commissions owed pursuant to his July 16, 2015 contract with the San Antonio Spurs and in accordance with the 2015 SPAC, and "in the manner in which Mr. Leonard has always paid such monies." Mr. Ginsberg's response was a clear acknowledgement that Mr. Leonard had made payments to the Defendants and that the Defendants had been and continue to illegally withhold monies due to Mr. Elfus under the 2015 SPAC and other relevant contractual arrangements (including the ISB Agreement), while

fraudulently leading Mr. Elfus to believe that Mr. Leonard has not made agent fee payments under the 2015 SPAC.

69. Mr. Ginsberg further stated that if Mr. Elfus engages in a legal dispute with Mr. Leonard upon receiving notice that all fees have been paid to the Defendants, then "Mr. Leonard will pursue the appropriate relief with authorities of the NBPA who supervise the certification and governance of agents." It is thus clear that Mr. Elfus' dispute lies with the recipient(s) of the commissions due to Mr. Elfus who have wrongfully withheld same from Mr. Elfus.

70. On May 9, 2018, BE, through the undersigned, informed Mr. Ginsberg that Heitner Legal, P.L.L.C. serves as legal counsel for BE and that, pursuant to Section 2 of the Tolling Agreement, BE was providing thirty (30) days' written notice to ISB of BE's intention to terminate the Tolling Date portion of the Tolling Agreement. The letter to Mr. Ginsberg was sent in compliance with Section 6(b) of the Tolling Agreement, which provided the notice requirement thereunder.

71. Mr. Ginsberg has experienced the same issues of non-payment from the Defendants as Mr. Elfus, and initiated a lawsuit against many of the named Defendants in the Supreme Court of the State of New York, County of New York, on December 27, 2017, alleging that Mr. Ginsberg and his law firm had consistently been told that his legal bills were being paid, and continued to provide legal services to IMPACT and ISB, despite receiving monies past due. According to Mr. Ginsberg, his law firm rendered legal services from 2014 through October 2016 that resulted in $675,689.33 in legal fees. *See* **Exhibit "G".**

72. Prior to the initiation of this lawsuit, Mr. Elfus came to a separate settlement agreement with Mr. Siegel, Elfus Sports Management, LLC, SiegelSports, Inc. and Elfus-Siegel Management ("ES Management"), which expressly provides Mr. Elfus the exclusive right to

demand and retain from any party, including ISB (explicitly named in the settlement agreement) and/or an ISB-related entity or person, a past present or future fee, percentage and/or commission generated from Mr. Elfus' clients, including any monies due (or to become due) for Mr. Elfus' clients pursuant to the ISB Agreement. As such, Mr. Elfus has authority to bring this suit without the need to join or seek approval from Mr. Siegel or ES Management.

73. At all times relevant, the Defendants have refused to provide requested information and negotiate in good faith, including but not limited to failing to deliver requested documentation surrounding internal and unaudited financials provided to Mr. Elfus by the Defendants.

74. Mr. Elfus has retained the law firm of HEITNER LEGAL, P.L.L.C. to represent Mr. Elfus in this litigation.

### COUNT I – BREACH OF CONTRACT (ISB AGREEMENT)
(against all Defendants)

75. Plaintiff repeats and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

76. Mr. Elfus and ISB entered into a contract that contained salary and commission compensation by ISB to Mr. Elfus as material elements. ISB has breached the ISB Agreement by underpaying Mr. Elfus his salary and failing to pay Mr. Elfus commissions past due. The requirement to make such payments has also been breached by IMPACT based on it commingling funds with ISB and its assignment of the ISB Agreement to JS, which also has put JS in breach of the contract. Further, J&J MM is in breach by way of it being an alter ego of JS and involved in the collection of agent fees as well as the management of professional basketball players.

77. Mr. Elfus performed all of his duties and obligations to the Defendants under the ISB Agreement.

78. Mr. Frankel, on multiple occasions, confirmed that he and ISB and IMPACT would pay Mr. Elfus the monies past due under the ISB Agreement.

79. JS assumed the responsibilities of ISB and the ISB Agreement upon purchasing the collateral from Cobalt relating to IMPACT and ISB, including but not limited to the ISB Agreement, and therefore assumed all duties and obligations as contained therein.

80. J&J MM has been completely involved in ISB's business, including but not limited to hiring ISB employees under its own corporate name, since JS purchased the collateral from Cobalt relating to IMPACT and ISB, including but not limited to the ISB Agreement

81. Defendants further breached the ISB Agreement by failing to ask Mr. Elfus to offer input regarding the sale, assignment or pledge of the ISB Agreement or rights or obligations thereunder to JS or any other individual or corporate entity.

82. The Defendants have failed to pay Mr. Elfus the monies he is past due under the ISB Agreement.

83. The Defendants failed to receive approval or input from Mr. Elfus before incurring numerous expenses, many of which had absolutely nothing to do with Mr. Elfus or his business, in material breach of the ISB Agreement.

84. Defendants failed to jointly collect revenues from basketball players with Mr. Elfus or even provide Mr. Elfus the opportunity to individually collect such revenues, pocketing all of the monies received from players and withholding same from Mr. Elfus, which was a material breach of the ISB Agreement.

85. Mr. Elfus has suffered damages as a result of the breach.

**WHEREFORE**, Mr. Elfus is entitled to recover damages in an amount no less than $1,479,484.80 resulting from Defendants' breach of the ISB Agreement.

## DEMAND FOR JURY TRIAL

Mr. Elfus demands trial by jury on all issues so triable as a matter of right by jury.

DATED this 22nd day of August 2018.

**HEITNER LEGAL, P.L.L.C**
*Attorney for Plaintiff*
215 Hendricks Isle
Fort Lauderdale, FL 33301
Phone: 954-558-6999
Fax: 954-927-3333

By: _____

DARREN A. HEITNER
Florida Bar No.: 85956
Darren@heitnerlegal.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been served on all counsel of record in this case as listed on the CM/ECF systems with the Clerk of the Court for this case, this this 22nd day of August, 2018.

By: _____

DARREN A. HEITNER
Florida Bar No.: 85956
Darren@heitnerlegal.com